And we'll call our second case 23 22 97 FTX V Vera Mr. Springer, whenever you're ready Good afternoon, Your Honor, so may it please the court. Brian Springer on behalf of the U.S. Trustee. I'd like to save three minutes for rebuttal if I'm sure Congress made the judgment that in bankruptcy cases involving more than $5 million in debts of the type described in the statute, bankruptcy courts must appoint an examiner to conduct an investigation when requested. As the Sixth Circuit in In Re Revco and the leading bankruptcy treatise have recognized, that command is apparent on the face of the statute. In Section 1104, Congress specified two independent conditions that trigger the appointment of an examiner. The first, in Subsection C1, looks to the interests of the creditors and other parties. The second, in Subsection C2, doesn't do that sort of interest balancing, but instead looks to the size and type of the debts that are at issue. When either of those conditions is satisfied and the other statutory prerequisites are met, the bankruptcy court is required to appoint an examiner. Our case involves Subsection C2, and here there's no dispute that the prerequisites there are met. The debt threshold is met. In fact, the FTX, the cryptocurrency company, itself has admitted that it has more than $100 million in custodial funds that it owes to customers just on the U.S. platform itself. So once those conditions are met, the bankruptcy court was required to grant this appointment request. So what do you make of it? I'm sorry. Go ahead. Your opponents say the term, as is appropriate, is important here. What does that signify in the context of the structure and the plain language of the text? Your Honor, the term, as is appropriate, is attached to the idea of conducting an investigation. And so what that language does is it leaves the bankruptcy court with significant discretion to set the scope, duration, and cost of the ultimate examination that's been made. But it doesn't sort of stretch further back and change the appointment. The appointment is mandatory, and then the bankruptcy court will look at formal proposals and decide what actually needs to be investigated here. And your opponents also say that if we don't agree with your position here, it will cause a great deal of administrative difficulties in processing the bankruptcy. I'm not sure. Is there anything that can't, that the, obviously all big bankruptcies have a lot of administrative difficulties. Is there anything that stops the trustee or the bankruptcy judge from dealing with these so-called difficulties? Your Honor, I think that the bankruptcy court is able through, you know, use it because of the as is appropriate clause, the bankruptcy court has the ability to sort of fashion an appropriate investigation in a case. I mean, I would just point out that the Sixth Circuit has decided in 1990 that this provision is mandatory when there's a request for an examiner and the statutory requirements are met. And we haven't seen the sort of fallout that the other side is suggesting would come with recognizing what the statutory text says here. And I would also just note as well that, you know, these appointments don't arise with much frequency. I can tell you that in the entire fiscal year 2022, the U.S. trustee filed fewer than 10 of these motions. That's my understanding. Are those motions when the assets were in excess of $5 million? Your Honor, I believe that that's correct. It may be that it encompasses both the C-1 and C-2 cases. What do you make of your colleague's concerns with respect to the costs and thereby reducing the recovery available if the judge did appoint an examiner? So, Your Honor, I have a couple of responses to that. One response is that the bankruptcy court will be able to look at a proposal that's made by the examiner that's been appointed and make a formal decision based on what the examiner eventually suggests should be investigated here about what the cost and scope and duration of this proceeding should be. I would also just note that in many previous large bankruptcy cases where examiners were appointed, examiners conducted, for example, in the InReCred bankruptcy, it was another cryptocurrency bankruptcy case. That was a situation where when an examiner was appointed, the examiner did an eight-week investigation. The final budget was under $2 million, and the bankruptcy judge expressed great gratitude for the work that the examiner did. The examiner found certain facts that weren't even known to the parties, including that one of the chief financial officers was a fugitive from the U.K. So these things provide value to the creditors. Whether or not the examiner eventually finds some kind of wrongdoing or finds specific claims that can be brought or not, this is a way of creating a more efficient system. So talk about what are the things that, you know, allay the absurdity concerns on the other side here. What judges commonly do to minimize the delay of the cost and the expense if they think that doing so is appropriate? So, Your Honor, usually the way this works is that after the appointment is made, which it's made in consultation with the parties, the examiner will go to the bankruptcy court with a proposal of how much money this is going to cost, how long it will take, and some of the topics of investigation. And the bankruptcy court is able to sort of set all of those things. So if, for example, if in a case where, you know, there's some kind of necessary expediency, the court might set a very expedient timeline for this investigation to take place. As I mentioned, in the In Re Cred case, there was an eight-week investigation that was done. In another cryptocurrency bankruptcy case, In Re Celsius, there was a four-month investigation that was done. And there, you know, the bankruptcy court is able to set the budget of those things and expand the budget if the examiner finds things that, you know, additional things that need to be looked into as part of the examination, part of the investigation. So the bankruptcy judge took great comfort in the protocols in place currently, right? And that's one of the reasons he didn't appoint an examiner. What do you make of that? And how is, how would it not be duplicative of your office's efforts? Your Honor, I think that there are still things that could, topics that are helpful to, for an examiner to look into here. Maybe it would be helpful just to provide a couple examples. For example, when Mr. Ray came on as a new CEO, he made some very quick decisions about which employees should be let go and which employees should stay on. And an examiner, you know, although the ousted management has been blamed, there's sort of dueling narratives in this case. And it would be helpful and important for an examiner to look into whether any of the current employees, including some who formerly worked for the law firm that's representing the debtors, acted improperly, particularly when there may be intercompany claims. You know, different entities under the debtor umbrella may have claims against each other. So it's important to have an independent person come in and conduct an investigation and at the end issue a report that explains what investigation was conducted and specifically what findings were made by the examiner, which are not requirements when the debtor or, that's not a requirement that's imposed on the debtor or the committee. So would the reading of your friends on the other side make C2, C1 surplusage or is that, as is appropriate, distinguishable from the best interests of the creditors? Your Honor, I think the other side's reading would basically make C1 surplusage because, and you can see that from the analysis that the bankruptcy court performed here. If you look at JA 17 to 18, the things that the bankruptcy court was flagging were exactly the types of balancing of, you know, the burdens and the interests of the creditors and the parties. The as is appropriate language, of course, applies to an investigation that would be conducted whether the examiner is appointed under C1 or under C2. But I don't think that their reading of, you know, the as is appropriate language, the way they're reading it is just to sort of bring in the exact same concerns that come through when someone moves under C1 for an appointment. Your Honors, if there are no further questions, then I would like to reserve the remainder of my time. Sure. Thank you. Good afternoon, Your Honors. Please, the court, I am Jonathan Lipson, Temple Law School, on behalf of Meeki Bankruptcy Law Professors in support of the petitioner, the United States trustee. I only have a few minutes and I only want to say three things to you and then answer any questions you have. Number one, I am here today because earlier in my career, I led and published two  examiners in large Chapter 11 cases, the subject of today's appeal. In all of my studies, I have never seen a freefall bankruptcy this spectacular precipitated by allegations of such serious misconduct that did not also have an independent investigation and report on the causes and consequences of the debtor's collapse by a truly independent examiner or trustee. Enron, WorldCom, Lehman Brothers, New Century, Refco, all had them, which means that if the bankruptcy court's decision is affirmed today, it would be a first. It would also mark a turning point in the role that transparency plays in Chapter 11 reorganization. If the bankruptcy court is not reversed, then Judge Dorsey will have single-handedly gutted Section 1104C because if an examiner is not appropriate in this case, an examiner is not appropriate in any case. Point one. Point two, Judge Dorsey, as you have already indicated in your questions, believe that the debtor's new CEO, John Ray, could perform the duties of an examiner. But as far as the public record is concerned, he hasn't. And as far as the statute is concerned, he can't. As you doubtless know, Mr. Ray made some very strong statements about the debtors and their founders at the outset of these cases. About eight days into the job, Mr. Ray told the bankruptcy court, quote, Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information has occurred here. Several weeks later, he told Congress that FTX debtors were, quote, a dumpster fire. Assuming he's right, Mr. Ray's statements require an answer to the most important question presented in all freefall bankruptcies, which is this, where were the gatekeepers? Well, we know where at least one of the gatekeepers is now. Sullivan and Cromwell, the debtors' counsel, is here arguing against an independent investigation and report that would answer this very question. As we explained in our brief, Sullivan and Cromwell, according to its own retention pleadings, were counsel to the debtors and certain insiders, including the recently convicted bankman, Freed, before bankruptcy and were thus an important gatekeeper. They billed at least eight and a half million dollars in 20 transactional and regulatory matters over 16 months before bankruptcy. Now, dumpster fires, to use Mr. Ray's words, are hard to hide. So we have to ask, did Sullivan and Cromwell not see this, quote, complete failure of corporate controls because Bankman Freed hid it? There was no smoke with this dumpster fire? Or did they simply look the other way? The answer matters for two reasons. Number one, the estate may have causes of action against pre-bankruptcy gatekeepers, including its lawyers, just as the Enron debtors had against their pre-bankruptcy lawyers. Number two, as we explained, there are critical questions about Sullivan and Cromwell's role in the change of control from Mr. Bankman Freed to Mr. Ray in the days leading up to the bankruptcy. If, as one reading of the evidence suggests, Sullivan and Cromwell or their alumni at FTX were assuring Bankman Freed that he would play an important role in the debtors reorganization, while simultaneously assuring that that could never happen because they were inducing his criminal prosecution, both ethical questions and contractual questions arise. If, as in C, knowingly misled Bankman Freed into giving up control of the company, they may have violated ethical duties of candor and the change of control may never have been legally effective in the first place, which would, among other things, mean that the Chapter 11 bankruptcy may never have been properly commenced. Now, I want to be clear. I am not accusing Sullivan and Cromwell, in fact, of having committed malpractice, in fact, of having violated ethical rules, in fact, of having fraudulently induced Bankman Freed to give up control of the company. I am, however, asserting that these are critical questions. And that they themselves cannot answer those questions. That, however, is what they persuaded the bankruptcy court to do. That is what they would have this court do. And that, to put it in statutory terms, is the opposite of appropriate. Point three, time is of the essence. The debtors seek to propose and affirm a plan of reorganization by the spring of next year. Ordinarily, that is laudable. Here, however, it threatens transparency because an examiner cannot be appointed after a plan of reorganization is confirmed. So, to provide some specificity to this court and to the lower court, our brief laid out in some detail the exact things we think would be appropriate to investigate and report on here. This is an urgent matter and we would exhort this court to reverse the bankruptcy court, remand and direct the bankruptcy court to order an examination of four very specific things. Let me stop you there. Can we do that?  No. I think it is appropriate to tell the bankruptcy court what the scope of the examination should be, given the as is appropriate language of a statute. As is appropriate, it would go to the scope of the investigation. Exactly. And you would ask us to give the bankruptcy court some direction as to what the appropriate scope is. Exactly. Exactly. And, you know, the concerns about cost, to be clear, they're totally legitimate concerns. Right. But there are very well established ways of managing those concerns. Right. The U.S. trustee already mentioned several of those, a budget, a time frame. In addition, having a very tailored scope of investigation that doesn't duplicate the work that Sullivan and Cromwell and Quinn Emanuel and Mr. Ray are doing. I'm sure they're doing many things that are very valuable to the creditors that an examiner would have no business being involved with. But the key question, predicate to all other questions, is where were the gatekeepers? So an examiner must investigate the debtors' pre-bankruptcy gatekeepers. What role did they play in the debtors' collapse and their role today? That's number one, gatekeepers. Number two, as we indicate in our brief, there is an extraordinary secrecy in this case. There is an unprecedented number of sealed and redacted pleadings on the doctrine of this case scores. The Reporters Committee for Freedom of the Press has appealed some of those sealing orders, which is before the district court right now. There may be good reasons for that secrecy, but we don't know. We know there was a lot of, you know, there's a fire. We know there probably was smoke. We don't know anything else. We don't know who's being investigated. We don't know what's being investigated. We don't know why. And so at minimum, number two, an examiner should inspect what is sealed, inspect what is redacted and at least tell us, yes, it's OK, there are good reasons or no, there aren't. We cannot tell at this point. Number three, cryptocurrency assets are odd assets. We don't quite know what they are. In the CRED case and the Celsius case, an examiner was appointed to help the parties and the court reduce the likelihood and cost of litigation over an answer to that question and instead independently assess the nature of the assets. And as part of a report, explain what the examiner thought they were. They were property of the estate. They were property of creditors. Only going to be one of two things. An examiner can significantly reduce the cost of litigation and fighting by doing that. Those are the three key things an examiner should do. And then the fourth is simply write a report that is publicly available telling the investing public that Congress also wanted to protect in the Chapter 11 process exactly what happened with respect to these three critical questions and to make appropriate recommendations depending on what he or she finds. So in conclusion, FTX marks an inflection point in the role that transparency plays in Chapter 11 reorganization. To affirm the Bankruptcy Court here is to ignore the plain language of Bankruptcy Code. Senator DeConcini, one of the shepherds of the Bankruptcy Code, said examiners were intended by Congress to investigate and report on, quote, large cases of great public interest. There has never been a larger free fall case of greater public interest than FTX. For these reasons, the Bankruptcy Court must be reversed. Thank you very much. Thank you. I'm just going to start my clock here so I know what time I've got here. Thank you, Your Honors. Thank you very much for the time today. James Bromley of Solvent & Cromwell on behalf of the appellees, FTX Trading Limited and its affiliated debtors. Your Honors, I'm going to first address the arguments that have been made by the Office of the United States Trustee, and then I will briefly address the issues made by the amici. Your Honor, Your Honors, there are two sections that are at play here, Section 1104 and Section 1106 of the Bankruptcy Code. One cannot read Section 1104, which is about the duties of an examiner, without looking at 1106 as to what is an examiner. And it's important, Your Honors, because the U.S. Trustee sitting here today in November of 2023, less than one year, almost to the day, but just short of one year since FTX collapsed and filed into bankruptcy, what the United States Trustee's Office is not focusing on is the process that they just suggested to Your Honors does not exist in the Bankruptcy Code or rules. The idea that there should be a motion to appoint an examiner, and then the judge makes a determination that an examiner should be appointed. The statute in 1104 says, on notice and a hearing, right? So there has to be notice, there has to be a hearing, and the phrase, as is appropriate, has to mean something. You relate back, as is appropriate, not just to examiner investigation, you also refer back to notice and hearing. The process that the United States Trustee just set forth to Your Honors is that there is no determination whatsoever if the $5 million threshold is met, which we agree has been met in this case. Their view is you go to the court and say, Judge Dorsey, appoint an examiner, $5 million, and then we will come back and ask the court to determine the scope and the identity of that examiner. The United States Trustee disconnects this second step from 1104. 1104 just says, after notice and hearing, set off by commas, so you can use the hearing to determine, was it in fact $5 million involved, or under C-1, is it in fact in the interest of the creditors? But as is appropriate, is at the end of that phrase, last antecedent, most naturally refers back to what's right before it, such an investigation. The court shall order him to conduct such an investigation as is appropriate. That is correct, Your Honor. But if I may, if I can get to the fact that what happened in this circumstance was that there was a pretrial order entered by Judge Dorsey. That pretrial order laid out the issues that Judge Dorsey was going to deal with at the hearing. It was entered by Judge Dorsey. It was agreed to by the U.S. Trustee's office and by the debtors and the creditors committee. One of the issues that was supposed to be raised at that hearing was the scope of the appointment. The motion that the U.S. Trustee made said nothing about scope, nothing about anything that would allow the court to determine what might be appropriate under the circumstances. Right? So when we got to the hearing, the burden of proof was on the U.S. Trustee's office to say, why would it be appropriate? Why would anything be appropriate? So what we have here is Judge Dorsey, as the U.S. Trustee agrees in their papers, made a determination not just that an examiner wasn't necessary, but that an investigation wasn't necessary. But the statute doesn't give him that power. Yes, it does, Your Honor. It says shall. Shall appoint to conduct an investigation as is appropriate. The tell becomes may. Shall appoint. 1104A uses discretionary language. 1104C doesn't. How does your reading avoid making shall into may? You cannot read out as is appropriate. Shall is not simply, if as is appropriate didn't belong there, it would have stopped. Isn't that what is appropriate in the investigation? Not the appointment being appropriate. The judge here, Judge Dorsey, made factual findings based on a complete factual record. Testimony, witnesses with the ability to cross-examine, the ability to take depositions, which were not taken by the United States Trustee's office, unrebutted factual testimony that there are investigations that were going on. There were other investigations which were being conducted, not just by the debtors and the creditors committee, but by the Department of Justice with respect to criminal and an 18-day trial which concluded last week. I have an answer to the question. How does your reading avoid making shall into may? Because the question, Your Honors, is whether or not an investigation is appropriate. Would the statute mean anything different on your reading if it said instead of shall order investigation, may order investigation is appropriate? Would there be, can you point to any situation that would be covered by the statute that avoids, that defines some semantic difference between those two? With the addition, as is appropriate and shall, it becomes a question of whether or not there's an investigation that can take place. And that's why it's important to go back to 1106, Your Honors. Right? Because 1106 defines what an examiner is. And say, doesn't shall, shall, he has to appoint an appointment, an examiner as is appropriate, but he has to appoint the examiner. Your Honor, you need to take a look at 1106 if you don't mind. Right? 1106 talks about two types of examiners. 1106B talks about, one, an examiner who investigates and reports. That's examiner one. It also talks about an examiner who takes on the duties of the trustee that the court orders the debtor in possession not to perform. There are two types of examiners under the statute. That is not addressed at all by the United States Trustee's Office. So when you take conducting an investigation and put it into 1104, you are recognizing that there are two types of examiners that are set forth in the statute under 1106B, investigate and report, examiner one, and examiner two, which we in the bankruptcy practice refer to as an examiner with expanded powers, is an examiner that must, there's no discretion here, if the court decides that a debtor in possession should not have any duties of a trustee, and this is where we have to go to the statutory construct, we're talking about how the bankruptcy code is operated, if the bankruptcy court takes any duties of a trustee away from a debtor in possession, they have to go to the examiner. Here, we're talking about an examiner that investigates and reports, and I agree, that is the vast majority of examiners. Your Honor, does your copy of the U.S. Code have examiner prime and double prime in 1106? Because I don't see a different term used for these two supposedly different examiners. Well, that's because you have to then look at 1104, and the language in 1104, which is. Okay, are they printed in different colors in your edition? Because I don't see different colors or primes or any other difference between these terms that you want to disaggregate. To get, Your Honor, to give context to conduct an investigation of the debtor as is appropriate, an examiner to conduct an investigation of the debtor as is appropriate. The only way that that phrase has meaning is to look at what an examiner is. 1106 is what tells you what an examiner is. So, that's simply providing the definitional aspect of what examiner is described under 1104C. Now, Your Honors, if I could talk for a moment about the absurdity issues that we're facing here, because there are several things that the United States trustee takes issue with, with respect to absurdity. One is that what we have is a situation that allows the bankruptcy court to determine at some later date under a process that doesn't yet, that they refer to as existing that doesn't exist, that the scope of the examination should be able to be determined by the court, but it cannot be zero. Well, Your Honors, what has happened in circuits like the Fifth Circuit, where the courts have decided not to reach the issue of whether it's mandatory? They have simply said, and as Judge Glenn has said as well in the Southern District of New York, you know what I'm going to do? I'm going to appoint an examiner, and I'm going to either give no responsibilities or very limited responsibilities, a limited budget, and a limited time frame. And so, as Judge Sanchi said, and this is an issue, too, because the District of Delaware has never, at the bankruptcy court level, ever found that there's anything but discretion. And this goes back 25 years. Discretion to appoint or discretion to define the terms of the examination? Well, Your Honor, I think they fold into each other, but I think that if you go back and look at the bench decisions, it is discretion to appoint. If you look at what Judge Dorsey said in this decision, it's the discretion to frame the investigation as well as to appoint. I hear you respond to Professor Lipson's point that in every other major bankruptcy, there's been an examiner. This would be the first one that hasn't had one. Your Honor, this is the Is he wrong? Yes, he is wrong. Cite me one. Because here's the situation. He's wrong with the context and how he frames it, Your Honor. Which one? Give me the name of the bankruptcy. This one. Okay. And here's why, if I can No, but if I can give you the reason, Your Honor No, I asked. Is the answer that you don't have another one to cite to contradict the learned Professor Lipson? I don't have another case other than this one, but if I may explain the factual distinctions, Your Honor, right? Not in any of those other cases, many of which I was involved in, was this factual situation the same as it was here. We cannot ignore the fact, yes, FTX was a problem. Yes, it was a dumpster fire. Yes, it was a free fall bankruptcy. What about the conflict of interest? If I'm First of all, Your Honor, the conflict of interest does not exist. Judge Dorsey held an evidentiary hearing with respect to the retention of my law firm. The United States trustee had objected to that retention. The United States trustee, notwithstanding my colleague's comments, withdrew their objection and supported our retention. With millions of creditors, in this case, two continued their objection. Based on that factual determination, Judge Dorsey found that we did not have any issues. And all of the things that the learned Professor just mentioned are res judicata in favor of the estate and in favor of my firm. There is not an issue before this court to look at whether or not there was a conflict of interest because it has been judicially determined with evidence already. You mean law of the case, not res judicata. Law of the case is a flexible doctrine. But we did have a hearing. We had factual determinations. An order was entered at the time to appeal. That order has passed. And the learned Professor had the opportunity, if he wanted to show up as a friend of that court, he did not. The fact is, is that is simply for publicity consumption. What has happened in the years since this case has filed, Your Honors, is that everything that was represented to the court in February of 2023 has occurred. There have been substantial reports that have been written and delivered by the estate. Mr. Ray was found to be, by Judge Dorsey, to be independent and eminently qualified, as was his independent board of directors. There was an 18-day trial, and Mr. Bankman Freeh was convicted in less than four hours, including dinner, on Wednesday of last week. What we have, Your Honors, is a situation from a factual perspective, which is distinct from Lehman, from Enron, from WorldCom. This, the management team that existed pre-filing, was removed in its entirely. The entire head was cut off. The individuals that were installed are highly qualified, independent, found on the evidence by Judge Dorsey to be so. They have conducted investigations and are continuing to conduct investigations. There have been voluminous public reports filed. The Securities and Exchange Commission is conducting investigations, the CFTC, Congress, and the Department of Justice. Four pleas and one substantial conviction after one of the trials of the decade. When we were, I was sitting there last week and listening to Damian Williams, the U.S. Attorney for the Southern District of New York, standing on the steps of the courthouse, what did he say? He said, we are relentless. This is what relentless looks like. We have gone after this people in cybercrime. You need to understand, this is what's going to happen to you. We have plenty of handcuffs for everyone. The full power of the United States government, the Southern District of New York, the U.S. Attorney's Office, and the FBI, both of which were commented on by U.S. Attorney Williams, were brought to bear to investigate this very case. The only absurd result that we're talking about here is that the same Department of Justice is sitting here today pretending that none of that has happened. The fact of the matter is, is that Judge Dorsey gave them the opportunity to sketch out the scope. And the U.S. Trustee stood up in court and said, I want to boil the ocean. I want everything from the top to bottom to side to side. And Judge Dorsey said, that's going to cost $100 million. Are you sure that's what you want? Absolutely, the U.S. Trustee said. And the U.S. Trustee said, you must appoint that examiner. Your Honors, that's simply not the law. It makes no sense. But more importantly, it doesn't comport with the language of 1104 and 1106. Thank you. Thank you. Good afternoon. Good afternoon, Your Honor. Ken Pasquale from Paul Hastings for the Official Creditors Committee. Thinking about where to start, Your Honor, given the questions, given some of the comments. Start with shall. Excuse me? Why don't we start with shall? Shall can be read as may. The debtors have cited some authority in their brief. In this case, the only way, frankly, to read the statute in a logical way is to read it in that fashion. Otherwise, we do get, Your Honor, to the absurd result. Mr. Bromley mentioned one example of that absurdity. I think the other example of the absurdity is you don't have to have a fraud or mismanagement or any impropriety. If you read that part of the statute out, all that a party in interest has to do is raise their hand, make the motion. In a case like this, where the qualified unsecured debt is over $5 million, end of story. There doesn't have to be, under that rationale, any reason for the examiner to be appointed. That seems to me to be classic absurdity. The statute cannot logically be read that way. Your Honor asked for some examples. There's some language in the U.S. trustee's brief that delineates what went on in the legislative back and forth when this provision was being written. And it seems that certain members of Congress were quite concerned that a bankruptcy of this magnitude needed special rules. Am I wrong on that? Well, I think I wouldn't say you're wrong, Your Honor. I think there's not really any clarity in that legislative history. I don't think in this sense that it adds anything to the analysis, frankly. You know, in certain circumstances, of course, in interpreting statutes, it could. I just don't think that's the case here. I wanted to try to answer Your Honor's question. There are many cases where examiners are not appointed, when there are. In fact, I'll give you a couple that come to mind. I just was thinking about it since you asked. There was the McClatchy case, newspaper, in the southern district of New York, over a billion dollars in debt. The creditors committee, which my firm, my prior firm, and my current colleagues represented that committee, did the investigation. Two crypto cases now pending in the southern district of New York, Voyager and Genesis. No examiners in either of those cases. I could come up with others, but it is not in every case, Your Honor, for certain. The comments that we heard from especially the amicus is as if our committee does not exist. Our committee has a statutory authority to investigate. Section 1103C2 of the code provides a non-exclusive list of duties for a committee, including an investigation of the act's conduct and financial condition. This committee has participated over the last year, from the very moment it was appointed, in the investigations with the debtors across all of the issues important in this case. And that includes the pre-petition business. That, frankly, includes debtors counsel and some of the allegations we heard today. All of that has been and is being considered and investigated by not only the debtors, by the committee. I do take a little umbrage as I hear some of the comments as if the committee has done nothing for the last year. It is in the record, Your Honor, you can see, but I have to say it as well. Our committee has that duty. We take our financial, excuse me, our fiduciary duties very seriously. And so I think all of the things we heard about, rest assured, they are all being looked at. Let me go back to those examples you cited for us. Was there a request made by an examiner? I'm not aware of the, I was trying to think of large cases where there hasn't been one. I can tell you again, citing back to McClatchy, the committee did the investigation. Was there a request for an examiner? Yeah, I don't know off the top of my head, Your Honor, I'm sorry. Your Honor, I see my time is up unless there's more questions. Those were really the main points I wanted to make. Thank you. Thank you. Thank you, Your Honors. I'd just like to make three very quick points. The first is just to return to the text and the legislative history, which I think are both very clear that this is a shall command and that the shall applies to the appointment of the examiner. And maybe just to give as well a word about how this normally plays out in practice. There's typically a motion that's made to appoint the examiner. There can be a notice in hearing if there are questions about whether, for example, the $5 million limit is met here that wasn't disputed. Once the appointment is made, the U.S. trustee will actually pick a person and that person will come in and suggest, here's the scope of things that I would like to look at. The bankruptcy court will examine that proposal and then set, as I mentioned before, these things about scope, budget, and duration as necessary in each individual case. So that was the first point. Second point is that I think the other side spoke about Section 1106. I don't think that Section 1106 changes anything. Section 1106 provides that a minimum what the examiner will do is conduct this investigation and issue a report with the findings at the end of that investigation. And then the bankruptcy court has authority to add additional duties to the examiner that normally a trustee would be performing. So that's point two. And that is just my final point. I just want to make clear that we didn't specifically support the retention of any firm in this case. We objected to it, or the U.S. trustee's program objected to it. And this motion, the motion for the appointment of an examiner was sort of connected with that. The U.S. trustee wanted an independent person to come in and conduct an investigation and believe that the text requires that there's that independent examination in these cases. Your Honors, if there are no further questions, we would ask that this court reverse the bankruptcy court's order. Thank you. Thank you. Thank all counsel. The argument's in briefs. We will take this matter under advisory.